**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

RICARDO MARTINEZ,
        *Defendant-Appellant.*

No. 08-50141

D.C. No.
3:06-cr-01243-
DMS-3

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

CESAR J. ABARCA,
        *Defendant-Appellant.*

No. 08-50142

D.C. No.
3:06-cr-01243-
DMS-11

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JOSHUA CRUZ,
        *Defendant-Appellant.*

No. 08-50145

D.C. No.
3:06-cr-01243-
DMS-17

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

GEORGE FERNANDEZ,
        *Defendant-Appellant.*

No. 08-50147

D.C. No.
3:06-cr-01243-
DMS-5

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

  v.

RICHARD VALENZUELA,
   *Defendant-Appellant.*

No. 08-50150

D.C. No.
3-06-01243-
DMS-10

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

  v.

EDUARDO GONZALEZ-GALLEGOS,
   *Defendant-Appellant.*

No. 08-50151

D.C. No.
3:06-01243-
DMS-4

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

  v.

THOMAS DURKIN,
   *Defendant-Appellant.*

No. 08-50152

D.C. No.
3:06-cr-01243-
DMS-6

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
May 4, 2011—Pasadena, California

Filed June 22, 2011
Amended September 14, 2011

Before: John T. Noonan and Kim McLane Wardlaw,
Circuit Judges, and Edward R. Korman,
Senior District Judge.*

Opinion by Judge Noonan

---

*The Honorable Edward R. Korman, Senior District Judge for the U.S.
District Court for Eastern New York, Brooklyn, sitting by designation.

---

**COUNSEL**

Gordon S. Brownell, St. Helena, California, for defendant-appellant Ricardo Martinez.

Debra A. DiIorio, San Diego, California, for defendant-appellant Cesar J. Abarca.

Alex L. Landon, San Diego, California, for defendant-appellant Joshua Cruz.

Arza Feldman, Uniondale, New York, for defendant-appellant George Fernandez.

David A. Schlesinger, San Diego, California, for defendant-appellant Richard Valenzuela.

Stephen D. Lemish, El Cajon, California, for defendant-appellant Gonzalez-Gallegos.

Jerald L. Brainin, Los Angeles, California, for defendant-appellant Thomas Durkin.

Todd W. Robinson, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

---

**ORDER**

The opinion filed on June 22, 2011 is amended as follows:

At slip op. at 8462, lines 24-28: Change <Her motion . . .> to <His motion was denied, and he now appeals the

denial. The district court did not abuse its discretion under the circumstances, given the impending trial date, the length and security requirements of the trial, and the likelihood of serious inconvenience for witnesses and jurors. Abarca now contends that he was prejudiced by the denial of a continuance because his counsel had inadequate time to prepare for trial given the late notice that the government would not seek the death penalty. This argument may be more appropriately addressed . . .>

With this amendment, the panel votes to deny the petitions for rehearing. Judge Wardlaw votes to deny the petitions for rehearing en banc, and Judges Noonan and Korman so recommend.

The full court has been advised of the petitions for rehearing en banc, and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for rehearing are DENIED and the petitions for rehearing en banc are DENIED.

No further petitions for rehearing or for rehearing en banc will be entertained from any appellant other than Abarca.

---

## OPINION

NOONAN, Circuit Judge:

Ricardo Martinez, Thomas Durkin, Eduardo Gonzalez-Gallegos, George Fernandez, Cesar J. Abarca, Joshua Cruz, and Richard Valenzuela appeal their convictions of conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and their sentencing enhancement for carrying out the conspiratorial agreement by acts subjecting them to life imprisonment. We affirm the judgment of the district court.

## PROCEEDINGS

On June 6, 2006, a federal grand jury indicted twenty-two persons including the seven defendants on a single count of conspiracy in violation of 18 U.S.C. § 1962(d). A number of those indicted pleaded guilty. Several were severed to be tried separately. The seven defendants went to trial on October 15, 2007. The jury returned a verdict of guilty on January 4, 2008. Each defendant was sentenced to imprisonment for life.

This appeal followed. Conscientious counsel for the seven defendants make a multitude of points on their behalf.

## FACTS

Martinez is a member of the Mexican Mafia. Durkin, Gonzalez, and Fernandez are high-level associates in the Mexican Mafia. Abarca, Cruz, and Valenzuela are soldiers in this organization.

The history and activities of the Mexican Mafia have been well set out by Judge Trott in *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003). Beginning as members of a street gang incarcerated at Deuel Vocational Institution in Tracy, California in the 1950s, the Mexican Mafia became a presence in California prisons and in federal prisons within California. The organization had an ethnic identity: Hispanic. It had a form: hierarchical. The leaders — known as members — were chosen by existing members. Associates were aspirants to membership. The soldiers took orders. The objectives of the organization were power in the prisons and the control of drug trafficking within and outside the prisons. Despite the efforts of the authorities, the Mexican Mafia has survived for half a century. It enforces its will by violence including murder.

These characteristics of the Mexican Mafia, already observed in *Shryock*, were set before the jury in this case by

the testimony of a government expert on the organization and by the testimony of a former member. Its presence in Southern California was particularly emphasized. No witness disputed this evidence. The government also established beyond challenge the relation of each defendant to the organization.

Among the crimes proved to be committed in furtherance of the conspiracy were the following:

*The murder of Jabila Barragan.* Barragan was imprisoned at High Desert State Prison. Barragan claimed to be a member of the Mexican Mafia. Authentic members found the claim false. At their direction, on June 24, 2002, Barragan was stabbed to death in the day room of the prison. Abarca and Valenzuela were found by prison officials showering themselves to wash off blood from his body. That the two had killed in order to eliminate a specious member of the Mexican Mafia was shown to be the motive for the murder.

*The murder of Alvaro Hernandez.* Hernandez came to the attention of Gonzalez as someone who was extorting money from individuals in the San Diego area in the name of the Mexican Mafia. Believing this claim of authority to be bogus, Gonzalez sought permission from the leadership to kill him. Durkin supported his request. Martinez granted it. Gonzalez arranged for Fernandez to carry out the deed. Fernandez delegated its execution to Cruz, who shot and killed Hernandez shortly after he had been lured from his house at 3:00 a.m., July 28, 2006. The government established the role of the murderer and the accessories to the murder by a number of intercepted telephone calls and intercepted correspondence.

*Methamphetamine trafficking.* On August 7, 2005, Durkin was observed by government agents receiving a purchase of methamphetamine at his home. On August 15, 2005, another purchase of methamphetamine was planned by Durkin and Gonzalez and took place under the eyes of federal agents,

who then arrested Durkin and found him in possession of 53 grams of the drug.

## ANALYSIS

We turn to the seven briefs for the seven defendants. Often they join their co-defendants' issues.

**[1]** *Crimes justifying life imprisonment*. The defendants question whether the life sentences were adequately supported. They did not request that the jury specifically identify the crimes justifying these sentences, but the jury's special verdict found them subject to the sentences, and the evidence before the jury established that Abarca and Valenzuela had acted for the conspiracy in the murder of Barragan and that Martinez, Durkin, Gonzalez, Fernandez, and Cruz had acted for the conspiracy in the murder of Hernandez. The sentences were justified under 18 U.S.C. § 1963(a).

**[2]** *Fernandez's lesser part*. Fernandez notes that the evidence does not establish that he managed or participated in the operations of the conspiracy, and he invokes *Reves v. Ernst & Young*, 507 U.S. 170 (1993). However, in 2004 we held that to be convicted of RICO conspiracy it is enough that the defendant agreed to facilitate a scheme which included the operation or management of a RICO conspiracy. *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004). Our Fernandez, not the defendant in the case just cited, was shown to have conspired in this way.

Fernandez further contends that he was not shown to have committed two overt acts. The government's burden was only to show his assent to the conspiracy and the acts furthering its end. *Salinas v. United States*, 522 U.S. 52, 63-66 (1997). That the government did.

**[3]** The government produced evidence that Fernandez was an aspirant to membership in the Mexican Mafia; that he put

money on the books of its members who were in prison; and that he made two sales of methamphetamine, in one sale attempting to recruit the buyer to the Mexican Mafia. In a coded letter to a Mexican Mafia member in prison, intercepted by the government and decoded by an expert, Fernandez wrote that "we sent another drunk driver to sober up forever for the relatives. That again was a favor for Thomas." Interpreted, the statement conveyed the information that at the request of Thomas Durkin, he had killed a man for the sake of the organization. The statement, together with other clues, linked him to the murder of Hernandez.

**[4]** Fernandez objects to the admission of a recorded conversation between himself and one Orka. The conversation contained no admissions as to his own part in the murder of Hernandez but did show his knowledge of the murder and his familiarity with the ways of the Mexican Mafia. It was admissible because it was an effort to recruit his addressee to participate in the conspiracy. The recording in its entirety was admissible as providing the context of his effort.

The challenge to admission of the conversation as a violation of the Confrontation Clause fails. *United States v. Bridgeforth*, 441 F.3d 864, 869 (9th Cir. 2006). Cruz's *Bruton* challenge also fails as there is a conspirator exception to the *Bruton* rule. *United States v. Larson*, 460 F.3d 1200, 1213 n.12 (9th Cir. 2006).

**[5]** *Statements incriminating Valenzuela*. Part of the evidence against Valenzuela was the statement of Raul Leon, a Mexican Mafia member incarcerated at Pelican Bay prison, made to another prisoner and referring to Barragan, "He was saying he was a Carnal. So as soon as he got up there to the High Desert, I had his ass killed." The statement was admissible as that of a coconspirator advancing the conspiracy's aim to maintain power in the prisons. Valenzuela's objection to admission of the statement is meritless.

Valenzuela also objects to testimony of another inmate that Abarca told this inmate to spread the word to Pelican Bay that "the job was done," a message calculated to enhance the power of the conspiring and therefore also admissible under Rule 801(d)(2)(E).

*The witness with a double capacity*. F.B.I. Special Agent Allan Vitkosky was the case agent. He testified as a percipient witness of some events and was recognized by the court as an expert on the Mexican Mafia's coded communications and in that capacity was also a witness. The defendants' language on the telephone and in correspondence was laconic, elliptical, or cryptic. As an expert, Vitkosky interpreted their coded messages. In the course of the trial, the court instructed the jury three times on the difference between percipient and expert testimony. The government was nearly always exact in specifying when it was asking for his testimony as an expert.

**[6]** In dicta we have pointed out the danger of confusion for the jury when a witness has such a dual role. *United States v. Freeman*, 498 F.3d 893, 902-04 (9th Cir. 2007), but have held that the trial court has discretion to accept a witness in both capacities. *Id*. The district court did not abuse its discretion when it admitted Vitkosky's testimony properly identified as percipient or as expert. If, in the course of thirty-five days of trial, there was testimony from him where the distinction was not made clear, the defendants have not identified any testimony harmful to any of them.

The defendants do object to Vitkosky's testimony that "to drink a cup of tea" meant to be killed. As an expert, he explained that he had reached this conclusion from his inquiries among former members of the Mexican Mafia. They had told him that a "cup of tea" was a common term in the Mexican Mafia for approval of a "murder/assault." Vitkosky then interpreted "cup of tea" as short for "cup of green tea" and stated that so interpreted it equaled "green light."

**[7]** Vitkosky's testimony consisted in two parts: (1) the meaning of an expression used in the organization and (2) the derivation of the meaning. As the defense pointed out, his testimony as to the derivation made little sense. There are red, white, and black teas as well as green. But Vitkosky's guess as to the phrase's derivation did not destroy his testimony that the phrase was part of the argot of the mob and that as used by its members it could mean acts of ultimate violence. It was proper for the jury to hear and assess the strength of his testimony.

The defendants further challenge the adequacy and timeliness of the government's compliance with Fed. R. Crim. P. 16 in its disclosure of Vitkosky as an expert. Undoubtedly, the government's disclosure was not in the "timely fashion" required by the advisory committee note to Rule 16. The disclosure was made five days before trial. However, the disclosure was a month before Vitkosky testified as an expert, time enough for the defense to prepare. *See United States v. Mendoza-Paz*, 286 F.3d 1104, 1112 (9th Cir. 2002). Properly exercising its discretion, the district court denied a defense motion for a continuance to permit further exploration of the expert's credentials. *See United States v. Mejia*, 69 F.3d 309, 314 (9th Cir. 1995).

*The record of an interview of Gonzalez.* Gonzalez argues that he was prejudiced by the government's denial to him of the record of a proffer meeting conducted in the office of the United States Attorney on February 14, 2006. Gonzalez was then awaiting trial on an unrelated immigration offense. He hoped to receive a sentencing benefit in that case and so asked to meet with the government. It was agreed that any statement he made could not be used against him but could be used to impeach him or to rebut any defense he might make. In the course of the interview, Vitkosky asked him several questions relating to the Mexican Mafia. The government made a record of the interview.

Prior to trial in this case, the government disclosed to the defense that in the interview Gonzalez had stated that Hernandez was killed as a result of a personal dispute. At trial, the government also supplied a redacted version containing Gonzalez's statements regarding "a cup of tea." The district court's refusal to require more is now assigned as error.

**[8]** Rule 16(a)(1)(B) requires the government to produce upon request "any relevant oral statement" made by the defendant "in response to interrogation" by a government agent. We do not reach the question whether all statements made in proffer interviews must be produced under Rule 16. Gonzalez received what was relevant to his trial. His contention that not knowing the full contents of the report deterred him from taking the stand in his own defense is not credible. Gonzalez would not have wanted to be exposed to cross-examination. He was given the benefit of his self-serving lie about the motive for the hit on Hernandez. No harm was done to Gonzalez by the district court's ruling.

Gonzalez also contends that in the interview he had spoken to the government about his brother-in-law Granillo's quarrel with Hernandez and would have liked to have called Granillo as a witness in this case but did not because he didn't remember what he had told the government about him. Gonzalez has made no showing that this handicap denied him a witness who would have materially contributed to his defense.

Durkin also objected to being denied this report, but had no right to the report under Rule 16.

**[9]** *The apprehensive juror.* On the seventh day of trial, one juror sent the judge a note asking if the jury had "protection." The judge interviewed her to determine if she could serve with an open mind. She answered affirmatively, stating, "I want to hear all the evidence." The defendants asked for a mistrial. The district court did not abuse its discretion in denying their motion.

**[10]** *Martinez's sobriquet*. In a letter from Gonzalez to a member of the Mexican Mafia, he referred to Martinez as "the Evil One." The district court did not abuse its discretion in denying Martinez's motion to exclude the reference. The evidence was more probative as to the fear inspired by Martinez than prejudicial. *See* Fed. R. Evid. 403.

**[11]** *The measures taken by the trial court to assure security*. Observing the nature of the case and the background of the defendants, the court ordered the defendants to wear leg shackles in court; arranged for at least ten marshals to be present; and empaneled an anonymous jury. The shackles were not visible in any respect. The defendants' contention that the cumulative impact of the security measures prejudiced the jury asserts a conclusion contrary to precedent in a Mexican Mafia trial. *See Shryock*, 342 F.3d at 971-75. The district court did not abuse its discretion.

**[12]** *Lay opinion on coded communications*. Durkin and other defendants objected to the lay opinion of a former member of the Mexican Mafia on the meaning of their coded communications. The witness testified that he was a member of the organization for seventeen years, and that the codes did not change. The district court did not abuse its discretion in admitting his testimony. From long experience in writing notes for the organization, the witness had the "personal knowledge" required by Fed. R. Evid. 602; *Freeman*, 498 F.3d at 904-05.

**[13]** *Durkin's request for substitute counsel*. James Brown, Durkin's appointed attorney, was late for one scheduled hearing and missed another because of car trouble. The court investigated Durkin's complaint. Brown apologized. Durkin professed to be content with him. Then on July 25, 2007 and August 3, 2007, Durkin wrote the court asking for a substitute. Again the district court investigated and heard both Brown and Durkin. The court found no breakdown in the attorney-client relation. Two weeks before trial, Durkin com-

plained again, the court held a hearing, no breakdown or unreconcilable conflict was found. On appeal, no abuse of discretion has been shown.

**[14]** *The Homicide Book*. The subject of this section has a title comparable to the Domesday Book but a mundane content: the record maintained by the San Diego Police Department of its investigation of the Hernandez murder. The district court ruled that Cruz was not entitled to reports within the book of police interviews with witnesses nor to summaries of recorded phone calls. The reason: the material sought constituted work product of the police, exempted from discovery by Fed. R. Crim. P. 16(a)(2). The rule extends to the protection of the internal product of local police work later provided to the federal government. *United States v. Fort*, 472 F.3d 1106, 1119 (9th Cir. 2007).

*Other objections by Cruz*. Cruz contends that the prosecution did not comply with the Jencks Act, 18 U.S.C. § 3500. The government in fact complied with Cruz's request eight days before its witness testified.

**[15]** Cruz also objects to admission of a telephone conversation in which he discussed bringing drugs into jail eight months after the murder of Hernandez. Contrary to Cruz's contention, the evidence was relevant to the conspiracy's aim of controlling narcotics in the prisons. The prejudicial effect of this recorded conversation did not outweigh its probative force.

**[16]** *The distinction between murder and conspiracy to murder*. The district court properly responded to a question from the jury that murder and conspiracy to commit murder were distinct racketeering offenses under RICO. The law in California makes the difference between a conspiracy and its product. *People v. Moore*, 143 Cal. App. 2d 333, 340-42 (1956). The two crimes could be charged under a single head-

ing in the indictment. *See Salinas*, 522 U.S. at 63. The two crimes were distinct although they led to a single event.

*Motions for severance*. The defendants objected to being tried together especially as only two of them were alleged to be connected to Barragan's murder and the other five were alleged to be involved with the murder of Hernandez. The defendants moved several times for severance during the trial and were denied.

[17] All seven defendants were charged with only one count of conspiracy carried out by a variety of means. If there was a spillover from proof of one criminal act to proof of another criminal act it followed from the overarching character of the criminal enterprise. The district court did not abuse its discretion in denying the motions. *See Fernandez*, 388 F.3d at 1241-46; *United States v. Dinome*, 954 F.2d 839, 843 (2d Cir. 1992).

[18] *Severance for Abarca*. Abarca's trial counsel submitted to the court a request that the trial be severed or at least continued. His motion was denied, and he now appeals the denial. The district court did not abuse its discretion under the circumstances, given the impending trial date, the length and security requirements of the trial, and the likelihood of serious inconvenience for witnesses and jurors. Abarca now contends that he was prejudiced by the denial of a continuance because his counsel had inadequate time to prepare for trial given the late notice that the government would not seek the death penalty. This argument may be more appropriately addressed in an action of habeas corpus because it focuses on deficiencies in his counsel's performance. *See United States v. Simas*, 937 F.2d 459, 463 (9th Cir. 1991).

## CONCLUSION

For the reasons stated, the judgment of the district court is AFFIRMED.