# United States Court of Appeals
## For the First Circuit

No. 13-1066

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN WENOR BRESIL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge.]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Víctor Ramos-Rodríguez, with whom Wilfredo Díaz-Narváez, was on brief, for appellant.
Kelly Leann Tiffany, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, were on the brief, for appellee.

September 24, 2014

**KAYATTA, Circuit Judge**. John Wenor Bresil was convicted of illegally reentering the United States after he was found in the middle of the night by Coast Guard and Border Patrol officials in an open boat with seventeen others twenty-three nautical miles off the coast of Puerto Rico. On appeal he argues that he was wrongly prevented from showing at trial that he did not intend to enter the United States but instead was passing Puerto Rico on his way to the island of St. Maarten. Specifically, he argues that: (1) the district court wrongly denied him a continuance after the government announced its intention to call an expert witness only five days before trial; (2) the government violated his due process rights by sinking his boat after it took him into custody, preventing a conclusive determination of whether it contained enough fuel to make it to St. Maarten, and by deporting others found in the boat with him who would have testified that the boat was traveling to St. Maarten; and (3) there was insufficient evidence to support his conviction. Though we find that the government plainly violated Federal Rule of Criminal Procedure 16, we affirm because that violation did not prejudice Bresil, and his other claims are without merit.

## I. Background

The basic facts leading to Bresil's conviction are not disputed. On the evening of March 19th, 2012, a border patrol aircraft was patrolling the Mona Passage, the body of water that

lies between the islands of Hispaniola (which contains Haiti and the Dominican Republic), to the west, and Puerto Rico, to the east. At around 9:40 P.M., the aircraft detected a vessel about 30 miles southwest of Puerto Rico traveling toward that island. Border patrol agents tracked the vessel as it traveled northeast toward Puerto Rico until it came to a stop twenty-three nautical miles off the coast at approximately 1:00 A.M.

Only then did a Coast Guard vessel intercept the boat, which was twenty-six feet long and six feet wide with a forty horsepower outboard engine and eighteen people aboard. The boat had taken on two feet of water by the time the Coast Guard reached it. From their vessel, the Coast Guard officials reported seeing in the bottom of the boat a number of empty fuel containers and one fifteen gallon container that was 75 percent full. The boat's outboard engine did not have an internal fuel tank, instead drawing fuel from a container. After the passengers were taken onto a Coast Guard vessel, the Coast Guard set fire to the boat in order to sink it because, government witnesses testified, it was a hazard to navigation if it remained where it was and they were unable to safely tow it somewhere else. When interviewed, all eighteen passengers on the boat said that they had departed from Miches in the Dominican Republic.

Bresil was indicted on one count of illegally attempting to return to the United States after being deported for commission

of an aggravated felony.  8 U.S.C. § 1326(a)(2), (b)(2).  Bresil was convicted on the sole count of the indictment and sentenced to 78 months' imprisonment and 36 months' supervised release.  This appeal of his conviction followed.

## II. Discussion

### A. Timing of the Government's Rule 16 Disclosure

The Government first informed Bresil of its intention to call an expert witness who could testify about the boat's fuel consumption five days before trial.  The expert proposed to testify, and eventually testified, that, based on the type of boat, the number of people in it, and the weight of fuel, it would have traveled at most two and a half to three nautical miles per gallon of gasoline.  St. Maarten is approximately 175 nautical miles from the eastern coast of Puerto Rico.

Federal Rule of Criminal Procedure 16(a)(1)(G) provides that "[a]t the defendant's request, the government must give to the defendant a written summary of any [expert] testimony that the government intends to use . . . during its case-in-chief at trial." Bresil had timely requested such a disclosure over a month previously.  In response to the government's disclosure, Bresil filed an emergency motion seeking a continuance to obtain his own expert and to further investigate other facts included in the government's disclosure which he claimed were new to him.  The district court denied Bresil's motion the same day he filed it on

-4-

the grounds that "[a]ll the facts movant claims as requiring additional investigative efforts were easily discernible from day one."

The government claims that Bresil waived any objection to its late notice under Rule 16 by not mentioning the rule by name in his motion seeking a continuance based on the government's notice that itself referred to Rule 16(a)(1)(G) explicitly. Not surprisingly, the government cites no precedent for this contention that a party need expressly cite a rule when that rule's application is obviously the point of the motion. Bresil made clear that he was seeking a continuance because he "need[ed], at least, the services of an expert in navigation/captain to analyze the evidence and inform us about the capacity of this boat to travel to St. Maarten." One reason he needed such testimony, his motion explained, was that the government intended to address this question with its expert. In sum, Bresil clearly raised and preserved his argument that the government's designation was filed at a time that warranted a remedy to avoid prejudice to Bresil. Because Bresil raised the issue before the district court we review for abuse of discretion. See United States v. Espinal-Almeida, 699 F.3d 588, 614 (1st Cir. 2012).[1]

---

[1] Bresil also suggests that the government's notice, in addition to being untimely, did not provide a sufficient summary of the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). He does not explain how the government's notice was insufficient,

Rule 16(a)(1)(G) "is intended to minimize surprise that often results from unexpected expert testimony, [to] reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note (1993 Amendment). The fact that Bresil knew that the boat's fuel usage would be at issue at trial does not excuse the government of its duty under Rule 16(a)(1)(G) to give timely notice of its intent to call an expert who would marshal evidence on that issue in service of the government's case. It is one thing to be prepared to argue about a fact at trial, but quite another to prepare to rebut an expert who can testify about implications of that fact in a way different from a lay witness. Prior to the government's notice, the government gave no indication that it would be presenting evidence to the jury that, if the government witnesses were right about the amount of fuel on board, the boat had only a fraction of the fuel it needed to make it to St. Maarten.

The government's notice was plainly untimely because it is unreasonable to expect a defense attorney in the midst of trial preparation to drop everything and try to obtain an expert five days before trial. See United States v. Martinez, 657 F.3d 811,

---

however, and our review of that notice does not show any obvious omissions, much less omissions which could have prejudiced Bresil.

-6-

817 (9th Cir. 2011) (government disclosure of expert five days before trial not "timely" but district court was within its discretion to deny a continuance where expert's testimony was a month away); United States v. Hoffecker, 530 F.3d 137, 184-88 (3d Cir. 2008) (defendant's disclosure of expert three business days before jury selection untimely); United States v. Johnson, 228 F.3d 920, 922, 926 (8th Cir. 2000) (government's disclosure of expert six days before trial in violation of district court order untimely). Not knowing when to fold a losing hand, the government nevertheless suggested at oral argument that because "Puerto Rico is an island and it's surrounded by ocean" and one of the island's largest marinas was located "forty-five minutes away" (from the courthouse, presumably) it would have been "easy" for Bresil's counsel to obtain an expert on short notice. The government provides no evidence for its claim that this would be easy, however, and, having no experience trawling marinas for experts on outboard motorboat fuel efficiency, we can hardly presume it to be so. More to the point, the government should not be able to send defense counsel on such a hunt when defense counsel is trying to get ready for trial.

The government also suggested at oral argument that denying the motion for a continuance was appropriate because, by the time the motion was filed, the government had already flown in its witnesses, so granting a continuance would have caused

-7-

inconvenience for the government and the agencies for which its witnesses work. In other words, the government claims that it can create a last minute exigency by violating a rule, and then block a remedy for the defendant merely because a remedy would be inconvenient for the government. This argument falls of its own weight and suggests that the government does not take its obligations under Rule 16 seriously.

Nonetheless we affirm because "[t]o obtain a reversal based on a Rule 16 claim, a defendant has to show prejudice." Espinal-Almeida, 699 F.3d at 614; see United States v. Melucci, 888 F.2d 200, 203 (1st Cir. 1989) (where results and identity of handwriting expert were not disclosed until four days before expert testified at trial, the district court did not abuse its discretion by admitting the testimony because the defendant did not explain how late disclosure prejudiced him). With the benefit of hindsight (and time), it turns out that, when pressed to explain after the trial what an expert actually could have said that might have helped his defense, Bresil makes no claim that any expert could have materially challenged (or, indeed, challenged at all) the technical claims upon which the testimony of the government's expert was based. In other words, no defense expert would have challenged the opinion that, given the factual assumptions made by the government expert, the boat could not have traveled more than two-and-one-half to three nautical miles per gallon.

Instead, Bresil suggests that presenting his own expert would have allowed him to challenge the government expert's assumptions (about, for instance, the weight of the passengers) that were incorporated into his calculations about the distance the boat could travel on a given amount of fuel. But those assumptions were just that--assumptions dependent on facts to which lay witnesses testified. No expert--and Bresil does not say he would have called any additional non-expert witnesses if granted a continuance--could testify to such facts. And if it is facts, not expert testimony, that Bresil wishes to have explained, then as the district court observed in denying the motion to continue, Bresil had long had ample incentive to challenge the facts. Moreover, as it turned out, it was highly improbable that any changes in the facts could have materially changed the conclusion. The type and size of the boat and its motor were undisputed, as was the number of passengers. Bresil says that the weight estimates the government's expert used were high, but there is no claim that lesser estimates on the margins would have made a material difference.[2]

For these reasons, this is an instance of foul, but no harm. We caution the government, however, that our holding arises from the particular facts of this case and we do not lightly find

---

[2] One would need to increase the boat's fuel efficiency six-fold to make it plausible that the boat had enough fuel to make it to St. Maarten.

harmless such a clear violation of Rule 16. By failing to disclose experts in a timely fashion parties risk not only undesired and inconvenient continuances but also the exclusion of their expert's testimony entirely. See Fed. R. of Crim. P. 16(d)(2) ("If a party fails to comply with this rule, the court may . . . prohibit that party from introducing the undisclosed evidence . . . .").

**B. Due Process Claims**

Bresil argues that the government violated his due process rights by destroying the boat, which contained evidence of whether or not it had enough fuel to travel to St. Maarten, and by deporting other passengers who, he argues, would have testified in his defense that the boat was traveling to St. Maarten. Because Bresil raised both arguments in the district court, we review de novo the district court's legal conclusion that Bresil's due process rights were not violated. See United States v. Teague, 469 F.3d 205, 210 (1st Cir. 2006).

Bresil's argument concerning the destruction of the boat fails because he does not show that there was anything else the Coast Guard could have safely done. He provides no reason to doubt testimony of government witnesses that it was unsafe for them to board the boat to conduct a more thorough inventory of its contents; that, had the boat been left where it was, it would have been a "hazard of navigation;" and that the Coast Guard vessel was not technically capable of safely towing it to another location.

Absent any reason to doubt these claims, it is hard to understand what Bresil thinks the government should have done. Moreover, because the evidence in the boat was "no more than 'potentially exculpatory evidence,'" he is only entitled to a new trial if he can show that the government acted in bad faith by destroying the boat. Magraw v. Roden, 743 F.3d 1, 8 (1st Cir. 2014) (quoting Arizona v. Youngblood, 488 U.S. 51 (1988)). Bresil does not argue, nor would the record support an argument, that the government acted in bad faith and so his due process argument concerning the destruction of his boat fails. See id.

Bresil also argues that the government violated his due process rights by deporting the other people on the boat who, he says, would have testified that they were going to St. Maarten. The boat contained eighteen people when stopped by the Coast Guard. The record reflects that five of those eighteen people, including Bresil, gave sworn statements that they were heading to St. Maarten, while a sixth passenger gave a sworn statement that he was heading to Puerto Rico. Of the twelve remaining passengers, one, Bresil's sister, was prosecuted for illegally attempting to enter the United Sates, but charges against her were dropped (the record does not reveal why). It is unclear if she was then deported but, even if she was, she was in the United States, apparently legally, at the time of Bresil's trial. The parties agree that the remaining eleven passengers, about whose stated destination the

-11-

record is silent, were deported the day the boat was stopped and there is no reason to think they reentered the United States.

Of the five passengers who claimed to be going to St. Maarten, one later recanted and pled guilty to illegally attempting to reenter the United States, expressly admitting that he was going to Puerto Rico. Excluding Bresil, that left three passengers who made un-retracted claims that they were headed to St. Maarten. At some point before Bresil's trial and before Bresil's counsel interviewed them, the government deported all three.

Bresil argues on appeal that all the deportations violated his due process rights. However, he limited his argument in the district court to the deportation of four passengers who initially gave sworn statements that they were headed to St. Maarten[3] and so review of his due process argument with regard to the other passengers would, at best, be for plain error. We first discuss Bresil's preserved due process argument and, finding that it fails, need not reach his unpreserved argument as it must fail for the same reason.

Our assessment of Bresil's complaint that the deportation of the four passengers who initially claimed they were going to St. Maarten violated his due process rights begins with the Supreme

_____

[3] He also argued that the government shouldn't have deported his sister, one of the twelve passengers who did not give sworn statements, who, he says, would also have testified that she was going to St. Maarten. But since the record shows that she was in the United States at the time of his trial this claim was moot.

Court's decision in United States v. Valenzuela-Bernal, 458 U.S. 858 (1982). In that case the Court found that the government did not violate the due process rights of a man prosecuted for transporting an illegal alien into the United States when it deported two other people he transported. Id. at 874. Valenzuela-Bernal could be read as applying a single-prong test under which a defendant's due process rights are violated when witnesses are deported "only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses" such that there is "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." Id. at 873-74.

Other circuits, however, have added a second, bad-faith prong to the test by drawing on the Court's statement in Valenzuela-Bernal that "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution," id. at 872, and on Youngblood's characterization, 488 U.S. at 57, of Valenzuela-Bernal as a case in which the government's good faith is relevant. See United States v. Damra, 621 F.3d 474, 485-90 (6th Cir. 2010); United States v. Chaparro-Alcantara, 226 F.3d 616, 623-24 (7th Cir. 2000); United States v. Dring, 930 F.2d 687, 693 (9th

-13-

Cir. 1991); <u>United States</u> v. <u>Iribe-Perez</u>, 129 F.3d 1167, 1173 (10th Cir. 1997).[4]  Under this view, if the government deports a person with no reason to believe the person would give exculpatory testimony in some case, the prosecution of that case does not violate the defendant's due process rights.

We need not decide in this case whether an absence of government bad faith can defeat Bresil's argument that the deportations violated his due process rights.  At the time the government deported the other passengers, it presumably knew that it might charge Bresil with illegally reentering the United States and that his defense would likely be that he was going to St. Maarten and not attempting to enter Puerto Rico.  It also knew that four passengers had, at least at one point, claimed to support that assertion.  We therefore assume that Bresil has satisfied any bad

---

[4]  While we have never explicitly discussed the role of good faith in applying <u>Valenzuela-Bernal</u>, we have done so in interpreting <u>Youngblood</u>.  <u>See</u> <u>United States</u> v. <u>Garza</u>, 435 F.3d 73, 75-76 (1st Cir. 2006).  We have also described "the Supreme Court's jurisprudence [as] divid[ing] cases involving nondisclosure of evidence into two distinct universes . . . ," <u>United States</u> v. <u>Femia</u>, 9 F.3d 990, 993 (1st Cir. 1993), one beginning with <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), and the other enunciated in <u>Youngblood</u> and <u>California</u> v. <u>Trombetta</u>, 467 U.S. 479, 485 (1984).  In grouping <u>Youngblood</u> and <u>Trombetta</u> together we noted, <u>see</u> <u>Fermia</u>, 9 F.3d at 993, that both rely on <u>Valenzuela-Bernal</u>.  <u>See</u> <u>Youngblood</u>, 488 U.S. at 55; <u>Trombetta</u>, 467 U.S. 485.  Unlike <u>Youngblood</u> and <u>Trombetta</u>, <u>Brady</u> has no good faith requirement. <u>Brady</u>, 373 U.S. at 87.  Declining to read a bad-faith prong into <u>Valenzuela-Bernal</u> when we have read one into <u>Youngblood</u> and made clear that <u>Youngblood</u> and <u>Valenzuela-Bernal</u> apply the same principle would thus be, at minimum, in tension with our precedent.

faith prong by showing the government's awareness of the potential exculpatory value of the testimony of the people it was deporting.[5]

Bresil's appeal therefore turns on whether he has also established that testimony by those passengers deported to the Dominican Republic to a "reasonable likelihood . . . could have affected the judgment of the trier of fact." Valenzuela-Bernal, 458 U.S. at 873-74. We think not, for four reasons.

First, and most importantly, given the direction in which the boat was traveling (north-east toward Puerto Rico rather than straight east toward St. Maarten), the location in which it was intercepted (23 nautical miles from Puerto Rico and more than 175 nautical miles from St. Maarten), the limited fuel on board, and the fact that it was traveling at night without lights, it is highly unlikely that any reasonable jury would have believed any claim that the boat was headed to St. Maarten based merely on self-serving assertions to that effect from other passengers.[6]

Second, if it had retained the four passengers Bresil says it should have retained, a prudent government would also likely have retained the other passenger who said from the start that he was going to Puerto Rico and the government would have

_____

[5] Because we find that Bresil's argument fails on other grounds, we also need not decide precisely how much knowledge by the government of a witness's exculpatory value would be sufficient to satisfy the defendant's burden under a bad-faith prong.

[6] Bresil does not argue that the passengers, had they been called, would have claimed anything other than they were headed to St. Maarten.

-15-

likely waited until Bresil's trial to deport the passenger who pled guilty to attempting to reenter the United States. The credibility of the testimony of the three passengers who consistently said they were going to St. Maarten would have been undercut by the testimony of the other two passengers who admitted to attempting to enter the United States. In this respect, no passenger testimony was likely better for Bresil than conflicting passenger testimony.

Third, Bresil could have called as a witness his sister, who was on the boat and in the United States at the time of his trial. That he did not suggests he thought her "going to St. Maarten" story would not have held up to cross-examination.

Fourth, if Bresil is correct that the deportation wrongfully deprived him of relevant testimony, he could have put into evidence the favorable hearsay statements of the other passengers under Federal Rule of Evidence 804(b)(6). True, the testimony would not have been live for the jury, but it also would not have been subject to cross-examination by the government. Nor would the government have likely been able to offer the conflicting statements.

In short, it is hard to see how Bresil would have been better off if the five passengers (other than Bresil's sister) whose stated destinations we know (three St. Maartens and two Puerto Ricos) had testified. No one of these reasons alone necessarily defeats Bresil's argument. All four considered together, though, are sufficient to establish the absence of a

reasonable likelihood that testimony by the deported witnesses could have affected the judgment of the jury in a manner favorable to Bresil.

## C.  Sufficiency of the Evidence

Bresil's final argument is that there was insufficient evidence to convict him of attempting to reenter the United States. For the reasons we have stated above, far from being insufficient, the evidence was compelling that the boat and its passengers had embarked for and were heading to Puerto Rico.  Bresil, moreover, owned property in Puerto Rico and demonstrated no ties to St. Maarten.  In short, the circumstances of his capture were such that a rational factfinder could have found beyond a reasonable doubt that he intended to reenter the United States.

## III. Conclusion

For the foregoing reasons the judgment of the district court is <u>affirmed</u>.

<u>So ordered.</u>