# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 10, 2018          Decided August 17, 2018

No. 15-3040

UNITED STATES OF AMERICA,
APPELLEE

v.

NOE MACHADO-ERAZO, ALSO KNOWN AS GALLO, ALSO
KNOWN AS NOE MARCHADO-ERAZO,
APPELLANT

---

Consolidated with 15-3041, 15-3043

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cr-00256-8)
(No. 1:10-cr-00256-9)
(No. 1:10-cr-00256-20)

---

*Kira Anne West*, *Christine Pembroke*, *Marc Eisenstein*, and *Thomas G. Corcoran Jr.*, all appointed by the court, argued the causes for Appellants. With them on the joint briefs was *Barry Coburn*, appointed by the court.

*Elizabeth Gabriel*, Assistant U.S. Attorney, U.S. Attorney's Office, argued the cause for Appellee. With her on

the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: ROGERS, WILKINS and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* ROGERS.

WILKINS, *Circuit Judge*:  Appellants – Yester Ayala (aka "Freeway" or "Daddy Yankee"), Noe Machado-Erazo (aka "Gallo"), and Jose Martinez-Amaya (aka "Crimen" or "Mecri") – were charged with conspiracy to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute, in violation of 18 U.S.C. § 1962(d), and various other crimes.  After a three-week trial, the jury returned guilty verdicts as to all three Appellants.

The District Court sentenced Machado-Erazo and Martinez-Amaya to concurrent terms of life imprisonment for RICO conspiracy and murder in aid of racketeering, and to 10 years' consecutive imprisonment for possession of a firearm during and in relation to a crime of violence.  Ayala was sentenced to concurrent terms of imprisonment for 20 years for RICO conspiracy and 30 years each for the remaining counts, and concurrent terms of five years of supervised release for each D.C. murder count.

Appellants now challenge their convictions and sentences on various grounds.  Because we find none of Appellants' challenges persuasive, we affirm.

3

## I.

### A.

According to the evidence presented at trial, Appellants were members of MS-13, a transnational gang founded in El Salvador.  At the time, MS-13 used a hierarchical structure.  The principal leaders of the gang, known as "la Ranflas," are located in El Salvador.  The second level of the hierarchy, "programs," function as collections of the lowest rung of the hierarchy, local "suborganization[s]" or "cell[s]" known as "cliques."  While Appellants were involved with MS-13, the cliques convened regular meetings at which members paid dues and discussed clique activities.  The cliques also obtained funding by collecting "taxes" ("renta") from certain entities within their respective territories.  Each clique had two leaders, the primary leader, who had the "first word" ("primera palabra"), and the secondary leader, who had the "second word" ("segunda palabra").  Within a clique, MS-13 members were assigned specific roles, including "recruiter," "extortionist," "keep[er] [of] weapons," and treasurer.  Groups of cliques comprised "programs," which were run by the gang's leadership in El Salvador (the "Ranfla").

Members of MS-13 marked their territory with graffiti, used hand signals to identify themselves, and tattooed their bodies with gang symbols.  Gang members were expected to abide by strictly enforced "rules" that mandated attendance at regularly scheduled clique meetings, the payment of dues, the refusal to cooperate with law enforcement, and the murder of rival gang members ("chavalas").  Members who failed to follow these rules were subjected to physical punishment or death.  MS-13's leaders authorized the killing of a recalcitrant member by issuing a "green light," which other gang members

were expected to execute when possible or face punishment or death themselves.

At trial, the Government presented evidence that Machado-Erazo and Martinez-Amaya were members of the Normandie clique in the D.C. area, and that both had leadership roles. Machado-Erazo helped financially support the clique through drug dealing and the extortion of local brothels and other drug dealers. Moises Humberto Rivera-Luna (aka "Viejo Santos"), who oversaw MS-13's activities in the Washington, D.C. area despite being incarcerated in El Salvador, called on Machado-Erazo to "improve the [Normandie] clique." J.A. 1603-04. Machado-Erazo worked with one of the clique's leaders, Jorge Solorzano, to achieve this goal. Machado-Erazo was also one of the leaders of "La Hermandad," a program of local cliques with the purpose of "clean[ing] up the cliques" by "kill[ing] . . . the snitches." J.A. 1395, 1617-18, 1739.

Martinez-Amaya was sent from El Salvador to assist the Normandie clique when Dennis Gil-Bernardez (aka "Pando"), its longtime leader, was arrested in December 2008. J.A. 1082 (stating that Pando was arrested in December 2008), 1244 (stating that Martinez-Amaya (aka "Crimen") was sent to D.C. after Pando was arrested). Martinez-Amaya served as second-in-command to Solorzano, and when Solorzano was arrested, Martinez-Amaya became the clique leader.

The Government separately presented evidence that Ayala was a member of the Sailors clique, another clique in the D.C. area, and was one of its leaders in 2008.

**B.**

By superseding indictment filed on May 9, 2013, Appellants and four co-conspirators were charged with

conspiracy to violate the RICO statute, in violation of 18 U.S.C. § 1962(d).  Ayala was also charged with two counts of murder in aid of racketeering ("VICAR murder"), in violation of 18 U.S.C. § 1959(a)(1), and two counts of first-degree murder while armed, in violation of D.C. Code §§ 22-2101 and 22-4502.    In addition to the RICO conspiracy charge, Machado-Erazo and Martinez-Amaya were charged with one count each of VICAR murder and possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).

Appellants' trial lasted from June 18, 2013, to August 6, 2013.  Presentation of evidence lasted approximately fourteen court days, and the jury deliberated for eleven days.  The parties called approximately fifty witnesses and introduced over two hundred exhibits. *United States v. Machado-Erazo*, 986 F. Supp. 2d 39, 43 (D.D.C. 2013).  Among the government's evidence were testimony of co-conspirators regarding MS-13 activities in the D.C. area, consensual recordings of MS-13 meetings, and wiretaps of calls among MS-13 members, including the three defendants. *Id.*

The jury returned verdicts of guilty as to all three defendants.  Machado-Erazo and Martinez-Amaya were found guilty of (1) violating RICO, (2) VICAR murder, and (3) possession of a firearm during and in relation to a crime of violence.  The jury answered the special finding in the affirmative, determining that both defendants "did feloniously, willfully, and of deliberately premeditated malice aforethought kill and murder Felipe Leonardo Enriquez."  J.A. 709, 711.  The jury also found that the pattern of racketeering activity agreed to included (i) murder in violation of the D.C. Code or Maryland law; (ii) extortion in violation of the D.C. Code or Maryland law; and (iii) obstruction of justice.  The jury found, however, that the pattern of racketeering activity did not

include robbery, violation of federal narcotics laws, or witness retaliation or tampering. J.A. 708-09, 710-11.

Ayala was also convicted of participating in the same RICO conspiracy. The jury found that Ayala agreed to the same three racketeering activities, and returned guilty verdicts against Ayala as to two counts of VICAR murder and two counts of murder under the D.C. Code deriving from the killings of Luis Alberto Membreno-Zelaya on or about November 6, 2008, and of Giovanni Sanchez on or about December 12, 2008. J.A. 712-15.

After the jury rendered its verdict, Machado-Erazo and Martinez-Amaya filed timely renewed motions for judgment of acquittal and for a new trial based on the insufficiency of the evidence, as well as on other grounds not relevant here. The District Court denied both motions. *See Machado-Erazo*, 986 F. Supp. 2d at 57. Subsequently, the District Court sentenced Machado-Erazo and Martinez-Amaya to concurrent terms of life imprisonment for RICO conspiracy and VICAR murder, and to 10 years' consecutive imprisonment for possession of a firearm during and in relation to a crime of violence. The court sentenced Ayala to concurrent terms of imprisonment for 20 years for RICO conspiracy and 30 years each for the remaining counts, and concurrent terms of five years of supervised release for each D.C. murder count.

Appellants now challenge their convictions and sentences on various grounds. We consider Appellants' claims that other crimes evidence was improperly admitted in part II, their claims that cell-site data was improperly admitted in part III, and their other claims in an unpublished judgment issued herewith.

**II.**

Appellants challenge the admission under Federal Rules of Evidence 404(b) and 403 of the following acts of violence perpetrated by co-conspirators: (1) the July 29, 2008, murder of Luis Chavez-Ponce by Gil-Bernardez; (2) the October 6, 2008, shooting of Malcom Wilson, David Cook, and Dalton Beck by Gill-Bernardez; (3) August and September 2008 shootings in Sterling, Virginia; (4) the October 16, 2009, armed gang fight in Wheaton, Maryland; and (5) the December 9, 2009, shooting of Glorisnel Sorto by Mario Lopez-Ramirez.

Appellants argue that the Government did not tie this evidence to Appellants, and as such, the testimony with respect to these incidents, as well as photographs of the crime scenes, were not relevant and were unduly prejudicial. Appellants' Br. 36-37. Appellants assert that the "evidence was nothing more than evidence of bad character, or guilt by association, intended to sway the jury," and make the jury believe "that appellants would likely have committed the acts . . . alleged[.]" *Id.* at 37. The Government, however, argues that admitting this evidence was not in error because these crimes, some of which were charged as overt acts, were direct proof of the conspiracy, and thus were not subject to exclusion under Federal Rule of Evidence 404(b). Appellee's Br. 26-27. The Government has the stronger position here, and we hold that the District Court did not abuse its discretion in allowing this evidence.

**A.**

Below is a summary of the challenged evidence.[1] None of the three Appellants was present during any of these incidents,

---

[1] In reply, Appellants suggest that they object to the admission of additional evidence not specified in their opening brief. Reply 2.

but each of the incidents involved members of the Normandie clique, of which Machado-Erazo and Martinez-Amaya were members. And, as discussed further below, the evidence showed a close connection between the Normandie clique and the Sailors clique, of which Ayala was a member.

*Murder of Luis Chavez-Ponce*. At trial, co-conspirator Antonio Urrutia-Barrera, a member of the Normandie clique, testified that he was with Tokiro Rodas-Ramirez, Gil-Bernardez, then clique leader, and other members of the clique at an apartment complex in Riverdale, Maryland on July 29, 2008, when they spotted Chavez-Ponce, a rival gang member, riding a bicycle around the complex. J.A. 1227-29, 1342; Appellee's Br. 20-21. According to Urrutia-Barrera, Gil-Bernardez shot Chavez-Ponce. J.A. 1229.

*Shootings of Malcom Wilson, David Cook, and Dalton Beck*. Urrutia-Barrera also testified to the shooting of Wilson, Cook, and Beck that occurred in October 2008. According to Urrutia-Barrera, he, Gil-Bernardez, and other members of the Normandie clique were in a car in Reston, Virginia, when they saw rival gang members Wilson, Cook, and Beck in another car flashing gang signs. J.A. 1238-39; Appellee's Br. 21. The clique members went to one of their apartments, Gil-Bernardez

---

We decline to consider any arguments not specifically discussed in their opening brief, however. Fed. R. App. P. 28(a)(8)(A); *see, e.g.*, *United States v. Golliher*, 820 F.3d 979, 984-85 (8th Cir. 2016) ("We may . . . refuse to consider a challenge to a district court's decision to exclude evidence when the appellant fails to direct us to the part of the record that contains the substance of the excluded evidence, especially when the substance is necessary to evaluate admissibility under the Federal Rules of Evidence."); *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 534 (1st Cir. 2009) (holding that evidentiary challenges were waived due to failure to cite "relevant portions of the appendix or transcript").

grabbed his backpack, and then they went looking for the three rival gang members.  J.A. 1240.  Urrutia-Barrera testified that once they found Wilson, Cook, and Beck, they parked the car and started walking toward them, and Gil-Bernardez shot at them J.A. 1240-41.  Urrutia-Barrera testified that the gun Gil-Bernardez used was the same one used in the Riverdale, Maryland shooting.  J.A. 1242.  A victim of the shooting also testified to the incident during trial.  J.A. 1212-15.

*Shootings in Sterling, Virginia*.  Urrutia-Barrera testified about two shootings that occurred in August and September 2008, in Sterling, Virginia.  J.A. 1236.  On cross-examination, with respect to the first shooting, he testified that he was with two other MS-13 members, looking for rival gang members.  J.A. 1253.  When they found the chavalas, Urrutia-Barrera shot them.  *Id.*  Urrutia-Barrera testified that he shot the chavalas on Gil-Bernardez's instruction.  J.A. 1254.

*Armed Gang Fight on October 16, 2009*.  Special Agent Brendan Shelley and co-conspirator Manuel Saravia, a member of the Normandie clique, testified regarding a fight between MS-13 members and a group of individuals that occurred on October 16, 2009, in Wheaton, Maryland.  J.A. 1331-34, 1429-30.  The MS-13 members were armed with bolt cutters and other weapons.  J.A. 1429-30.  The fight broke up when law enforcement arrived.  J.A. 1334-35, 1430.

*Shooting of Glorisnel Sorto*.  Saravia testified that he and co-conspirator Lopez-Ramirez, also a member of the Normandie clique, shot Sorto, a rival gang member, on December 9, 2009, in Washington, D.C.  J.A. 1430-37; *see also* J.A. 1351-53 (testimony of a Government witness regarding the incident).  The Normandie clique reimbursed the price of the gun used in the shooting.  J.A. 1433.

None of the witnesses linked any of the incidents to any specific defendant, but all involved the Normandie clique.

**B.**

As a preliminary matter, the parties dispute the standard of review the Court is to apply. Appellants urge this Court to review their challenges to the admission of this evidence for an abuse of discretion. Appellants' Br. 34. Appellee, however, contends that this standard applies only to objections that have been preserved, and argue that Appellants preserved their objections only as to the Chavez-Ponce murder and the Reston triple shooting. Appellee's Br. 25-26. Accordingly, the Government states that the Court should review the admission of the evidence regarding the Chavez-Ponce murder and the Reston triple shooting for abuse of discretion, but apply the plain-error standard to the admission of the other evidence. *Id.* Appellants maintain that they "persistently objected" to the admission of the challenged testimony. Appellants' Br. 36 n.28.

Appellants are correct; at various times before and during trial, Appellants objected to the evidence summarized above, as well as other similar evidence, on the grounds that it was irrelevant and/or unduly prejudicial.[2] *See, e.g.*, J.A. 954-58 (denying Machado-Erazo's and Martinez-Amaya's motion to exclude any Rule 404(b) evidence), 1211-12 (objecting to the introduction of testimony regarding the Reston triple shooting), 1488-89 (objecting to testimony regarding the Sorto shooting), 1342-43 (objecting to evidence related to the murder of

---

[2] The District Court ruled that all defendants would be deemed to join any motion or objection made by a co-defendant during trial. J.A. 80. Accordingly, who made the objection is irrelevant for our purposes.

Chavez-Ponce); *United States v. Ayala*, No. 10-cr-256, ECF No. 342 (D.D.C. filed May 21, 2013) (motion to exclude co-conspirators' statements); *United States v. Flores*, No. 10-cr-256, ECF No. 165 (D.D.C. filed May 10, 2012) (motion to exclude irrelevant and prejudicial gang evidence); *United States v. Machado-Erazo*, No. 10-cr-256, ECF No. 143 (D.D.C. filed May 5, 2012) (motion *in limine* to preclude admission of co-conspirators' evidence). Accordingly, we review the admission of the evidence for abuse of discretion. *United States v. Johnson*, 519 F.3d 478, 483 (D.C. Cir. 2008).

## C.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Yet the rule permits such evidence for other purposes, including proof of motive, intent, knowledge, identity and absence of mistake. Fed. R. Evid. 404(b)(2). Indeed, "Rule 404(b) is a rule of inclusion rather than exclusion," *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000), "prohibiting the admission of other crimes evidence 'in but one circumstance' – for the purpose of proving that a person's actions conformed to his character," *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C. Cir. 1991)). "Rule 404(b) thus is not so much a character rule as a special aspect of relevance" because it "does not prohibit character evidence generally, only that which lacks any purpose but proving character." *Bowie*, 232 F.3d at 930.

Thus, a threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those

for which the defendant is charged, or instead is intertwined with the commission of charged crimes. Acts "extrinsic" to the crime charged are subject to Rule 404(b)'s limitations; acts "intrinsic" to the crime are not. *See Bowie,* 232 F.3d at 927; *see also United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010).

In conspiracy prosecutions, the prosecution is "usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000)). In addition, "where the incident offered is a part of the conspiracy alleged[,] the evidence is admissible under Rule 404(b) because it is not an 'other' crime." *United States v. Hemphill*, 514 F.3d 1350, 1357 (D.C. Cir. 2008) (quoting *United States v. Mejia*, 448 F.3d 436, 447 (D.C. Cir. 2006)). This Court has also permitted the introduction of "other acts" evidence in conspiracy cases to link a defendant to other defendants and drug transactions for which the conspiracy was responsible, *United States v. Gaviria*, 116 F.3d 1498, 1532 (D.C. Cir. 1997) (per curiam); to show the nature of a conspiracy and "the kind of organizational control" a defendant exercised, *Mahdi*, 598 F.3d at 891; and to show the defendants' intent to act in concert, *Mathis*, 216 F.3d at 26; *see also United States v. Straker*, 800 F.3d 570, 590 (D.C. Cir. 2015) (per curiam) (evidence of uncharged hostage takings was "relevant to . . . how those defendants started to work together as kidnappers").

The Government contends that because the conspiracy was defined as MS-13 more generally, and MS-13 activities in the United States extend back to the late 1990s, evidence of

MS-13 activity anywhere is admissible under Rule 404(b), subject only to Rule 403's limitations. Oral Arg. 58:10-59:25. Fortunately, we need not decide whether the Government's capacious determination of how a conspiracy can be defined and how it relates to Rule 404(b) is correct because under this Court's precedent and the definition of the conspiracy here, the challenged acts were intrinsic evidence of the RICO conspiracy – the evidence helped prove the nature of the conspiracy and the purpose of the enterprise. J.A. 125 (defining the conspiracy as all of the illicit activities of members of MS-13 in the District of Columbia ("La Hermandad")). Indeed, three of the purported other crimes – the Chavez-Ponce murder, the Reston triple shooting, and the Sorto shooting – were specifically charged in the indictment as overt acts of the conspiracy, *see* J.A. 131-33, and therefore do not constitute "other crimes," *see United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curiam).

Moreover, the challenged acts and the acts in which defendants were alleged to have actively participated are in close temporal proximity. The timeframe for the challenged acts spans July 2008 through December 2009. The evidence, taken in the light most favorable to the Government, shows that Machado-Erazo and Martinez-Amaya were members of the Normandie clique by at least December 2008. J.A. 1082 (Solorzano (aka "Cocky") became clique leader when Gil-Bernardez (aka "Pando") was arrested in December 2008), 1736-37 (Avila testified he knew Machado-Erazo from at least when Cocky took over the clique), 1244 (Martinez-Amaya (aka "Crimen") was sent to the area when Gil-Bernardez was arrested), 1598 (Martinez-Amaya was part of the clique before Solorzano became leader). The evidence also shows that Ayala was the leader of the Sailors clique in 2008. J.A. 1179, 1121, 1110. The evidence also showed that the Sailors and Normandies worked together to further the goals of MS-13.

*See, e.g.*, J.A. 1079 (discussing cooperation between Sailors and Normandies), 1085 (Sailors attended a Normandie clique meeting), 1111-12 (Sailors and Normandies were in contact with each other), 1117-18 (if one clique put a green light on someone, members of other cliques were obligated to act on the green light), 1724-28 (Sailors and Normandies fought together). "[W]here the incident[s] offered [are] part of the conspiracy alleged . . . the evidence is admissible under Rule 404(b) because it is not an 'other' crime." *Mejia*, 448 F.3d at 447; *Bowie*, 232 F.3d at 929.

The determination that this evidence does not constitute impermissible character evidence does not end the inquiry. Once a defendant raises a 404(b) objection, the district court must balance the probative value of the evidence against the risk of unfair prejudice. *McGill*, 815 F.3d at 883; *United States v. Lavelle*, 751 F.2d 1266, 1279 (D.C. Cir. 1985) (requiring a district court "to make an on-the-record determination" of whether the probative value of other-bad-acts evidence outweighs its prejudicial impact"). The District Court did not explicitly do so here, and this failure is particularly concerning where, as discussed above, the Government takes the broad position that evidence regarding MS-13 activity anywhere in the United States since the 1980s is admissible under Rule 404(b). The Government's position highlights the importance of the district court performing the requisite Rule 403 balancing on the record.

Nevertheless, because "the factors upon which the probative value/prejudice evaluations were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling," reversal is not required. *McGill*, 815 F.3d at 883 (citation and quotation marks omitted). The evidence here related solely to acts involving the Normandie and Sailors cliques and only during

time periods where one or more defendants were active in the cliques. Indeed, comparable other evidence was presented showing Appellants' involvement in other acts of violence committed by the gang, including: testimony connecting Ayala with the murders of Louis Membreno-Zelaya and Giovanni Sanchez, J.A. 1044-49, 1171, 1267-82, 1329-30, and Machado-Erazo and Martinez-Amaya with the murder of Felipe Enriquez, J.A. 1397-1404, 1476-77. Other evidence showed that murder, both threatened and actualized, is central to MS-13's control over its members and its ability to intimidate non-members. *See, e.g.*, J.A. 989-92, 1616, 1738, 1741, 1795. This evidence "dissipate[d] any prejudice associated" with the challenged evidence. *McGill*, 815 F.3d at 884.

Accordingly, we conclude that the District Court did not abuse its discretion by allowing the admission of the challenged evidence.

## III.

Machado-Erazo and Martinez-Amaya also challenge the testimony of the Government's cell-site expert, FBI Special Agent David Magnuson. Magnuson's testimony was offered to show that the cell phones used by Machado-Erazo, Martinez-Amaya, and a cooperating witness were in the vicinity of the remote area where the body of Felipe Enriquez was found on or about March 28, 2010, the date Enriquez was believed to have been killed. *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 51 (D.D.C. 2013). Magnuson's report depicted the geographic location of the cell towers used by the phones and analyzed the phones as they moved through the Cricket and T-Mobile cellular networks. *Id.*

Appellants contend that the District Court erred by allowing Magnuson's testimony because the Government deviated from its initial notice regarding Magnuson's testimony by proffering opinions about specific distances rather than broad ranges, Magnuson's testimony exceeded the bounds of his expertise, and the Government's subsequent notice regarding specific location testimony was untimely. We review for abuse of discretion a district court's evidentiary rulings concerning the admission of expert testimony. *United States v. Day*, 524 F.3d 1361, 1369 (D.C. Cir. 2008) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). However, "[e]ven when the [D]istrict [C]ourt has abused its discretion, reversal is appropriate only upon a concomitant finding that the error affected appellant's 'substantial rights.'" *See English v. Dist. of Columbia*, 651 F.3d 1, 7 (D.C. Cir. 2011) (citation omitted); *see also Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946).

For the reasons discussed below, we find that the District Court abused its discretion by allowing Agent Magnuson to testify regarding specific distances and ranges of distances because such testimony was neither disclosed pursuant to Federal Rule of Criminal Procedure 16, nor vetted as required by Federal Rules of Evidence 702 and 403. Nevertheless, because the error was harmless, reversal is not warranted.

**A.**

Before submitting their joint pretrial statement, the Government provided notice, *see* Fed. R. Crim. P. 16(a)(1)(G), that it intended to call Magnuson as an expert in cellular technology and the analysis of historical cellular telephone and cell site records. The Government also produced a copy of Magnuson's report – a series of maps with annotations but little explanatory text – which it contended showed the activity of

cell phones used by Machado-Erazo, Martinez-Amaya, and Saravia on the day of the Enriquez murder.

Approximately one week before trial, Machado-Erazo moved to exclude Agent Magnuson's testimony, arguing that the testimony was not based on a sufficiently reliable methodology as required by Rule 702 and that it would therefore be unduly prejudicial and excludable pursuant to Rule 403. *See generally Machado-Erazo*, 950 F. Supp. 2d 49. The Government opposed Machado-Erazo's motion, and asserted that Magnuson was a highly trained agent whose testimony was firmly based in scientific principles. The Government emphasized that Magnuson would not claim to have determined the exact location of the phone user, but rather the general location where a cell phone would have to be located to use a particular cell tower and sector. Government's Opposition to Defendant's Motion *in Limine* to Exclude Expert Testimony and Cellular Report of FBI Special Agent David Magnuson, *United States v. Machado-Erazo*, No. 10-cr-256, ECF No. 368 (D.D.C. filed June 12, 2013).

The District Court denied Machado-Erazo's motion *in limine*. *See generally Machado-Erazo*, 950 F. Supp. 2d 49. In addition to rejecting Appellants' "fundamentally erroneous contention . . . that a cell phone always connects to the closest tower at the time a call is placed," the District Court determined that "th[e] methodology employed by [ ] Magnuson clears the hurdle imposed by *Daubert* and [Federal Rule of Evidence] 702." *Id.* at 55, 56. The District Court relied on *United States v. Jones*, 918 F. Supp. 2d 1 (D.D.C. 2013) (rejecting similar arguments on a motion to exclude cell-site analysis), and *United States v. Davis*, No. 11-60285-CR, 2013 WL 2156659 (S.D. Fla. May 17, 2013) (permitting Magnuson to offer the

exact same type of testimony offered here after a *Daubert* hearing).[3]

During trial, which occurred before a different district judge, Machado-Erazo renewed his objection based on Rule 702. He also argued that the government failed to timely disclose that Magnuson would estimate a coverage range for the cell towers. J.A. 1497-98. The Government responded that the purported disclosure merely "describe[d] how [Magnuson] went about making his report," and emphasized that Magnuson would discuss only the "general range of the cell towers," not the specific location of a person, which was already endorsed by the District Court. *Id.* at 1498-99. The District Court overruled Machado-Erazo's objection, and permitted Magnuson to testify.

**B.**

Notwithstanding the Government's representation to the District Court, the Government elicited testimony from Magnuson about precise locations of the cell phones he analyzed. *See* J.A. 1497-98 (testifying to "a coverage range for the cell towers"), 1518-19 (testifying that the two phones were "very close" to a particular cell tower at the time of the murder), 1520 (testifying that that the phones were within "a half mile of th[e] tower" at the time of the murder), 1532-33 (testimony regarding the "proximity between th[e] two phones" at the time of the murder). Appellants contend that

---

[3] Appellants do not challenge the District Court's denial of the pretrial motion *in limine*. Instead, they claim only that the specific location testimony offered at trial exceeded the Government's proffer and Magnuson's expertise. Oral Arg. 5:36-6:20 (conceding that their concern was not with the general methodology of collecting and interpreting cell-site data, but rather with the specific location testimony).

admission of this testimony constituted an abuse of discretion. We agree.

Under Federal Rule of Criminal Procedure 16(a)(1)(G), "the government must give to the defendant a written summary of any testimony that the government intends to use under Rule[] 702 . . . during its case-in-chief at trial. The summary . . . must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The Government provided no such disclosure here. Indeed, the only summary provided pre-trial was a series of slides showing the location of cell towers and the cell sector for particular calls without explanation. J.A. 284-321. The briefing on the motion *in limine* did little to clarify the scope of Agent Magnuson's testimony, noting only that "[the] proposed testimony will not claim to have determined the exact location of the phone user," J.A. 639 n.1. The Government's disclosure and statements, then, left both the District Court and the parties to presume what the testimony would be. This, in and of itself, shows that the notice was deficient under Rule 16. Nevertheless, based upon a reported decision admitting Magnuson's testimony in another jurisdiction, as well as other decisions admitting other cell-site expert testimony, the District Court inferred the bases and reasons underlying Magnuson's opinions and denied the motion *in limine*. *Machado-Erazo*, 950 F. Supp. 2d at 53-58. Critically, the ruling was based upon the understanding that Magnuson would offer testimony about only the "general location" of cell phones, rather than precise locations. *Id.* At trial, before a different judge, the Government shifted gears and elicited testimony about more precise locations. By admitting this expert testimony without giving defendants sufficient prior notice and without first finding it to be relevant and reliable under *Daubert*, the District Court abused its discretion. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (en banc).

That the District Court abused its discretion does not end the inquiry, as "reversal is appropriate only upon a concomitant finding that the error affected appellant's 'substantial rights.'" *See English*, 651 F.3d at 7 (citation omitted). An error affects the appellant's substantial rights if it influenced or tainted the outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 734 (1993); *United States v. Smith*, 232 F.3d 236, 243 (D.C. Cir. 2000). As the Supreme Court noted in *Kotteakos*, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. at 765. Where the Court is sure "that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* Magnuson's expert testimony related solely to the murder of Felipe Enriquez. Given the breadth of evidence linking Machado-Erazo and Martinez–Amaya to the murder, much of which was undisputed, we find that admission of the challenged testimony was not prejudicial, and therefore reversal is not appropriate.

At trial, the Government presented the following undisputed and unchallenged evidence. First, Saravia, the Government's key witness, testified that during a clique meeting on March 6, 2010, Enriquez (aka "Zombie") disrespected Solorzano (aka "Cocky"), then-leader of the Normandie clique, and brought a knife to the meeting, which violated MS-13 rules. J.A. 1397-99. The Government submitted an audio recording of the clique meeting corroborating this testimony. *See* J.A. 826-877, 1737. This evidence provided the motive for the murder. Second, the Government presented wiretaps of a phone call during which Solorzano, Machado-Erazo, and Saravia discussed Enriquez's

behavior and agreed to call Rivera-Luna (aka "Viejo Santos"), who oversaw MS-13's activities in the Washington, D.C. area from an El Salvadorian jail, as well as a phone conversation during which Viejo Santos put a green light on Enriquez. J.A. 1744. Third, the location of the murder is undisputed. During trial, a detective testified that Enriquez's body was discovered in a wooded area off Ednor Road, near the Patuxent River, J.A. 1382-84, 1491, 1494, and that police recovered eight 9-millimeter cartridge casings near his body, J.A. 1387. Agent Magnuson's testimony further showed that phones linked to Saravia, Machado-Erazo, and Martinez-Amaya were connected to cell towers located nearest to the murder site at approximately the same time or close in time to each other. J.A. 1512-34. His permissible testimony also showed that phones linked to Machado-Erazo and Saravia were connected to the cell tower closest to Machado-Erazo's home prior to the time that the three phones were connected to the towers near where the murder occurred. Thus, Magnuson's permissible testimony corroborated Saravia's testimony that he and Machado-Erazo met before the murder and drove to the site of the murder together. J.A. 1402-16. Given this evidence, we cannot say that the District Court's erroneous admission of portions of Agent Magnuson's testimony affected Appellants' "substantial rights." We therefore reject Appellants' contention that their VICAR and firearm convictions should be reversed based on Magnuson's improper testimony.

* * *

For the foregoing reasons, we affirm.

ROGERS, *Circuit Judge*, concurring: I join the court's opinion holding that the district court abused its discretion by allowing Agent Magnuson to testify as an expert witness regarding specific cell tower distances and ranges of distances. I write briefly on the relationship between the district court's "gatekeeping" obligation under Federal Rule of Evidence 702 and the government's disclosure obligations upon defense request under Federal Rule of Criminal Procedure 16(a)(1)(G).

**I.**

A witness may testify as an expert only if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The district court must serve as a gatekeeper to the admission of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Although perhaps originally spawned by concerns about "junk science" masquerading as science, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 153 (1997) (Breyer, J., concurring), the "gatekeeper role" ensures more broadly that witnesses possess the relevant training or experience in the field of expertise on which they will testify, and that, if found qualified, their testimony stays within the realm of their expertise. "[T]o ensure the reliability and relevancy of expert testimony," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999), the district court has a threshold obligation to independently determine whether and to what extent a witness can testify as an expert, as well as a continuing responsibility to ensure, upon defense objection,

that the expert's testimony stays within permissible bounds. The heightened aura and weight to which a fact finder is likely to attach to expert testimony, as compared to lay testimony, *cf. United States v. Williams*, 827 F.3d 1134, 1160-61 (D.C. Cir. 2016), warrants the two-part nature of the gatekeeper role.

The district court's ability to fulfill its gatekeeping obligations is not unrelated to the government's compliance with Federal Rule of Criminal Procedure 16. Rule 16 states in relevant part:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

FED. R. CRIM. P. 16(a)(1)(G).

This disclosure mandate is designed to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Adv. Comm. Note to 1993 Amendment. Further, prompt notice of a putative expert's qualifications "will permit the requesting party to determine whether in fact the witness is an expert within the definition of Federal Rule of Evidence 702." *Id.* The Rule reflects a trend toward "freer disclosure" in criminal procedure. 2 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 251 (4th ed. 2018).

The Rule provides the district court with a range of remedial options: a continuance, exclusion of the evidence, or "any other order that is just under the circumstances." FED. R. CRIM. P. 16(d)(2). The district court's rulings under Rule 16 and FRE 702 are reviewed for abuse of discretion, *United States v. Day*, 524 F.3d 1361, 1367, 1370 (D.C. Cir. 2008), and an error is harmless if there was no "substantial and injurious effect or influence in determining the jury's verdict," *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

## II.

What is striking in the instant case is how the government's failure to disclose promptly its proposed expert's opinions and the bases for those opinions can hamstring the district court's effort to separate reliable expert testimony from "junk science." On June 10, 2011, defense counsel, by letter to the trial prosecutors, requested "a written summary of any expert testimony which the government intends to use under Rule[] 702 . . . in its case-in-chief at trial." The joint pretrial statement of May 21, 2013, indicated that FBI Special Agent David Magnuson would testify as an expert in historical cell-site analysis. Approximately one month before trial, the government turned over its expert's "report." This consisted of a series of maps where cell tower locations and angles were plotted; no "written summary" describing the nature of Magnuson's opinion was included.

Defense counsel moved to exclude Magnuson's testimony as an expert, arguing his testimony relied on a methodology that was "unreliable and irrelevant," and requested a hearing.

> Agent Magnuson's report does not describe the bases and reasons for his opinions or the inferences he draws. *See* Fed. R. Crim. P. 16(a)(1)(G). The report

> merely plots the presumed locations from which calls were made, the cell tower from which the call registered at its origin, and the relation to the crime scenes charged in this case. There is no indication how these plotted called are placed on the map or what determined their placement. The cell towers to which certain cell phones connected on a map have been used by Agent Magnuson to assume a basic coverage area. This is not supported by the facts or record in this case.

Def.'s Mot. to Exclude the Expert Testimony and Cellular Analysis Report and Charts of Special Agent David Magnuson (June 12, 2013) ("Motion to Exclude") at 2-3. Further, the defense argued that if Magnuson "testifies only to the cell tower location and side of the cell tower antennae that received the call," then he will be "acting not as an 'expert' but merely as a summary witness." *Id*. at 13. Referencing Magnuson's prior expert testimony, the defense also suggested that if allowed to testify as an expert he "may attempt to go far beyond this summary testimony." *Id*.

In opposing the Motion to Exclude, the government represented that Magnuson "will not claim to have determined the exact location of the phone user, but rather the general location where a cell phone would have to be located to use a particular cell tower and sector." Gov't Opp'n to Def.'s Mot. to Exclude Expert Testimony ("Gov't Opp'n") (June 12, 2013). Further, claiming neither a *Daubert* hearing nor peer review of the cell-site methodology was needed because it had been approved by a number of district court judges, the government also did not describe how Magnuson would use the cell tower locations in his "report" to project the likely area where a cell phone was located. The district court denied the defense motion, relying on the government's representations,

Magnuson's "report," and prior district court rulings allowing expert testimony on cell-site analysis. *See United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 55-58 (D.D.C. 2013).

Hours before Magnuson was scheduled to testify on the eighth day of the trial before a jury, the government turned over to the defense a document titled "Basic Principals [sic] Utilized in Record Analysis." It stated: "As a GENERAL RULE, most towers (depending on the environment) have a radius of approximately ONE or TWO MILES (greater or less distances are also common)." Defense counsel objected to the late disclosure and requested that Magnuson be treated as a lay witness. The district court permitted Magnuson to testify as an expert after the prosecutor represented Magnuson would testify only "as to the general range of the cell towers" and that the issue had been ruled on when the Motion to Exclude was denied. Trial Tr. 25-26 (July 8, 2013). Magnuson testified at length over two days (91 transcript pages) as an expert at appellants' trial. His testimony included a discussion of the areas where cell phones belonging to appellants and a co-conspirator were located on the day of Felipe Enriquez's murder. Magnuson also testified that a cell phone "had to be within a half mile" of a particular cell tower for the phone to connect to that tower. *Id.* at 51. On that basis, a cell phone belonging to the co-conspirator was located near Machado-Erazo's home on the day of the murder.

**III.**

At the point the district court would have had to make its threshold gatekeeping determination for purposes of FRE 702, the government had yet to disclose the "written summary" of its expert's testimony as required by Rule 16(a)(1)(G). The record does not reveal exactly why. Defense counsel had alerted the government to its obligation under Rule 16(a)(1)(G)

two years before trial, and Magnuson was a federal employee who had previously testified as an expert. To the extent the trial Assistant U.S. Attorney advised the district court that he had only obtained the document explaining cell-site analysis methodology shortly before Magnuson testified on the eighth day of the jury trial, that did not absolve the government of its obligations under Rule 16. The government's "dribbling out" of information about the nature and scope of its expert's testimony never quite described the level of detail on which Magnuson would testify at trial, much less the methodology he used, potentially leaving defense counsel unclear about the nature and scope of his expert testimony.

The consequence pertinent here is that the government's conduct interfered with the district court's ability to fulfill its gatekeeping role under *Daubert* and FRE 702. It hampered the district court in assessing with any measure of certainty whether the expert's testimony would be reliable much less, as defense counsel feared, would stray at trial beyond the contents of his "report." Neither Magnuson's "report" nor the government's representations described the methodology that he would use to connect appellants' cell phones to the cell tower locations. The district court attempted to fill this gap by relying on descriptions of cell-site methodology in other cases. This assumed Magnuson's methodology would be the same in appellants' case and limited the court's ability to pose inquiries of its own. In opposing the Motion to Exclude, the government implicitly invited this flawed approach by emphasizing that cell-site analysts had been accepted as experts by other district court judges, by arguing that the case appellants relied on where the district court rejected cell-site expert testimony was different, and by asserting that peer review was unnecessary because "cell phone technology is neither novel nor particularly complex." Gov't Opp'n at 6. Although a witness's testimony as an expert on a general subject matter in another case may

inform the *Daubert* analysis, that circumstance is not sufficient. The district court's "gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (internal quotations omitted). Indeed, "judicial acceptance is not relevant; what matters is general acceptance in the relevant *expert* (scientific or otherwise) community." *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016).

The district court judge who denied the Motion to Exclude found Magnuson's expert opinion reliable based principally on cell-site analyses accepted by two other district court judges. *Machado-Erazo*, 950 F. Supp. 2d at 55-58 (citing *United States v. Jones*, 918 F. Supp. 2d 1 (D.D.C. 2013); *United States v. Davis*, No. 11-60285-CR, 2013 WL 2156659 (S.D. Fla. May 17, 2013)). In *Jones*, the district court allowed an FBI agent to testify as an expert because his cell-site analysis was based on a reliable methodology, which the government had "clearly explain[ed]," and the agent did "not purport to portray the 'coverage area' of any particular cell tower or antenna." 918 F. Supp. 2d at 45. In *Davis*, the district court found, after holding a *Daubert* hearing, that Magnuson was "qualified to opine on call detail records" and "the areas most likely to fall within the sector serviced by a particular cell tower," by reason of his "knowledge, skill, experience, training, and education." 2013 WL 2156659, at *4.

If *Daubert* is to have meaning, then district court had to satisfy itself that the witness in appellants' case was an expert on a particular subject based on the witness's *actual* methodology and the scope of the opinions the witness would offer at trial. The expert's testimony in *Jones* was limited in scope, and the district court could not assume Magnuson's testimony would be the same in appellants' case as in *Davis*. The government's Rule 16 disclosures and vague representations were unhelpful in this respect; they did "not . . .

clearly indicat[e] the level of precision — or imprecision — with which [cell-site] evidence pinpoints a person's location at a given time." *Hill*, 818 F.3d at 299. Further, while defense counsel had alerted the district court to potential flaws in Magnuson's methodology, the district court found none, relying not on the government's explanation of the methodology he would use in appellants' case, but on the description of his methodology in *Davis*. *See Machado-Erazo*, 950 F. Supp. 2d at 55-56. Consulting other judges' analyses may be informative or persuasive, but not dispositive. Absent an independent evaluation of the expert's methodology and the nature of the expert's proposed testimony, real life tragedies can occur. *See, e.g.*, Pamela Colloff, *He Has Spent Three Decades in Prison. Now Experts Dispute the Evidence.*, N.Y. TIMES, July 24, 2018; *see also* Leora Smith, *How an Unproven Forensic Science Became a Courtroom Staple*, PROPUBLICA, May 31, 2018.

For much the same reason, *Daubert*'s monitoring obligation was frustrated. The district court judge who presided at appellants' trial relied on the pretrial *Daubert* ruling, which in turn relied on rulings in other cases, including one that involved a narrower use of a cell-site expert than occurred at appellants' trial and another that did not reveal the scope of Magnuson's expert testimony. Those rulings could not eliminate the need to independently monitor the expert's testimony at appellants' trial. Notwithstanding defense counsel's alert that Magnuson's expert testimony could stray beyond the government's Rule 16 pretrial disclosure of his "report," *cf. United States v. Moore*, 651 F.3d 30, 60 (D.C. Cir. 2011), Magnuson was allowed to opine that a cell phone "had to be within a half mile" of a particular tower. Trial Tr. 51 (July 8, 2013). Yet the maps in Magnuson's "report" contained no measuring scale and the document produced on the eighth day of trial stated only that the general range of a cell tower is

"approximately ONE or TWO miles (greater or less distances are also common)." Magnuson claimed the basis for his opinion was "the very nature of the cellular network, the fact that it's divided up into cells of [radio frequency] energy." Trial Tr. 51 (July 8, 2013). How Magnuson derived "within a half mile" from those vague statements was explained neither for the jury nor earlier for the district court. Absent a foundation, Magnuson's half-mile opinion was inadmissible under FRE 702. Even if the district court had remedial discretion to deny the defense request that Magnuson be treated as a lay witness due to the government's non-compliance with Rule 16, it was error to allow the jury to consider unsupported expert testimony.

In appellants' case, however, the Rule 16 and *Daubert* failings do not entitle them to relief because they show no prejudice: The government's evidence of their guilt was strong, including wiretap and co-conspirator testimony linking them to the murder, Op. 20-21, and the government's late Rule 16 disclosures were cumulative of information in its opposition to the Motion to Exclude. Consequently, "it was highly improbable that any changes in the facts could have materially changed the conclusion" of the jury at trial. *United States v. Bresil*, 767 F.3d 124, 127 (1st Cir. 2014); *see United States v. Martinez*, 657 F.3d 811, 817 (9th Cir. 2011). Still, what happened here with regard to the admission of Magnuson's expert opinion is concerning. Although "the prosecution is entitled to prove its case by evidence of its own choice," *Old Chief v. United States*, 519 U.S. 172, 186 (1997), one-sided enforcement of the evidentiary and procedural rules would be troubling, especially in criminal cases where liberty is at stake.